**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________

A.M., a minor, by and through their parents and next friends D.M. and B.M.; and
I.H., a minor, by and through their parents and next friends S.H. and W.H.,

Plaintiffs,

v.

POUDRE SCHOOL DISTRICT;
WAYNE THORNES, in his individual capacity;
EMILY BICKERTON, in her individual capacity;
DAVID OLIVER, in his individual capacity;
SONJA NOVOVESKY, in her individual capacity; and
JOHN DOES 1-5, in their individual capacities,

Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs, by and through undersigned counsel, respectfully allege for their Complaint and Jury Demand as follows:

## I. INTRODUCTION

1. In the spring of 2023, video footage from a Poudre School District ("PSD") school bus was reviewed by PSD officials and showed PSD bus attendant Tyler Zanella inflicting physical and psychological abuse on multiple elementary school students with autism, including Plaintiffs A.M. and I.H. These students were exceedingly vulnerable because their ability to complain or report what was happening to their teachers or parents was limited by being non-verbal/semi-verbal.

2. Each morning and afternoon, I.H. and A.M. rode to and from school on the bus to which Mr. Zanella was assigned, and morning and afternoon Mr. Zanella relentlessly physically

and psychologically tortured, bullied, and abused them or other defenseless young children with special needs. Mr. Zanella repeatedly hit, pushed, slapped, flicked, pinched, and antagonized A.M. and I.H., and he only stopped because he was caught due to a parent complaint that resulted in school officials watching bus video footage.

3. Perhaps most shockingly, Mr. Zanella's criminal history, including a conviction of child abuse, was known by PSD on or around the time it hired him, yet PSD hired him for a role that involved him having access to and authority over multiple exceptionally vulnerable young children. Multiple complaints about Mr. Zanella were made throughout his employment with PSD, yet PSD took no effective remedial action. PSD and the individually-named Defendants are directly to blame for the abuse, pain, and terror A.M. and I.H. suffered, which has resulted in their severe psychological harm.

4. Based on Mr. Zanella's assaults against and bullying toward A.M. and I.H., PSD, the PSD employees involved in hiring and supervising Mr. Zanella, and the PSD employees who failed to intervene in the abuse are liable under 42 U.S.C. § 1983 for violating the Fourteenth Amendment and the Americans with Disabilities Act, as well as for claims of negligence and outrageous conduct.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Colorado, and all of the parties were residents

of the State of Colorado at all relevant times stated herein.

## III. PARTIES

**Plaintiffs**

7. At all times relevant to this litigation, Plaintiff A.M. was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. Plaintiff A.M. is a minor and brings this action by and through his next friends and parents, D.M. and B.M.

8. At all times relevant to this litigation, Plaintiff I.H. was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. Plaintiff I.H. is a minor and brings this action by and through her next friends and parents, S.H. and W.H.

**Defendants**

9. Defendant Poudre School District ("PSD") is a public school district in Larimer County, Colorado, and is a "person" subject to suit under 42 U.S.C. § 1983. PSD operates and manages public schools throughout Larimer County. Among other things, at all times relevant to this litigation, PSD operated and managed the school bus that took students to and from PSD school Shepardson Elementary at 1501 Springwood Dr., Fort Collins, CO 80525.

10. PSD is also responsible for hiring, training, and supervising its employees, including those who ride the bus for the purpose of assisting and protect helpless, dependent, and disabled elementary school students.

11. Plaintiffs sent a timely notice of claims under the Colorado Governmental Immunity Act, C.R.S. § 24-10-101 *et seq*., to Poudre School District on or about August 7, 2023, providing notice of potential liability of PSD and its employees arising from the facts of Mr. Zanella's abuse of A.M. and I.H. as described herein.

12. At all times relevant to this litigation, Defendant Wayne Thornes was a citizen of

the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Thornes was acting within the scope of his official duties and under color of state law in his capacity as Principal of Shepardson Elementary School.

13. At all times relevant to this litigation, Defendant Emily Bickerton was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Bickerton was acting within the scope of her official duties and under color of state law in her capacity as Assistant Director of Human Resources for PSD.

14. At all times relevant to this litigation, Defendant David Oliver was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Oliver was acting within the scope of his official duties and under color of state law in his capacity as a bus operator for PSD.

15. At all times relevant to this litigation, Defendant Sonja Novovesky was a citizen of the United States and a resident of and domiciled in Colorado. At all relevant times, Defendant Novovesky was acting within the scope of her official duties and under color of state law in her capacity as Transportation Supervisor for PSD.

16. At all times relevant to this litigation, Defendants John Does 1-5 ("Doe Defendants") were citizens of the United States and residents of and domiciled in Colorado and were acting within the scope of their official duties and under color of state law in their capacity as employees of PSD. The Doe Defendants are PSD officials, whose names are currently unknown to Plaintiffs, who were involved in hiring Mr. Zanella after learning about his criminal history and those who failed to adequately respond to parent complaints against him.

17. Defendants Thornes, Bickerton, Oliver, Novovesky, and Doe Defendants are collectively referred to herein as "Individual Defendants."

## IV. FACTUAL ALLEGATIONS

**Mr. Zanella repeatedly assaulted, harassed, and taunted young children with special needs.**

18. PSD officials, including Defendant Emily Bickerton, the Assistant Director of Human Resources for PSD, hired Mr. Zanella on or about August 29, 2022, as a bus attendant. His job entailed assisting bus drivers on routes where such assistance was needed or required by federal law under a student's individualized transportation plan—meaning he was in part hired to assist elementary school children who were frequently non- or semi-verbal students with disabilities such as autism. Mr. Zanella's duties included tending to the children on the bus by, for example, helping them buckle in and stay safe during transport.

19. On or about May 23, 2023, PSD notified Fort Collins Police Services of suspected assault committed by Mr. Zanella against students at PSD. Fort Collins Police arrested Mr. Zanella on May 24, 2023, based on video footage from the school bus that showed Mr. Zanella hitting a child on the bus on three different days.

20. The review of video footage was sparked by a complaint that Mr. Zanella had called a student "a little bitch" on May 22nd; school officials on May 23rd reviewed bus footage of the previous day and witnessed suspected physical abuse, prompting them to contact the police.

21. PSD fired Mr. Zanella the following day.

22. On or around May 26, 2023, PSD informed the parents of A.M., who was six years old at the time, and the parents of I.H., who was then nine years old, that Mr. Zanella had physically assaulted and verbally harassed A.M. and I.H. on bus rides to and from school.

23. Both A.M. and I.H. have autism and are semi- or non-verbal, which meant they were not only exceptionally vulnerable to Mr. Zanella, but were also unable to tell their parents about his reign of terror against them and other students.

24. Starting at the latest in late March 2023, but likely during the entire school year before that—according to PSD, existing footage from the buses Mr. Zanella worked on only goes back so far—Mr. Zanella repeatedly assaulted A.M. and I.H. (as well as other young children with disabilities).

**<u>Mr. Zanella repeatedly targeted A.M. for abuse and harassment.</u>**

25. Mr. Zanella could not resist targeting A.M. and enjoyed nothing more than assaulting and tormenting him. Every chance he had to inflict pain and misery on A.M., he seized.

26. Among other things, during bus rides in March, April, and May 2023, and often multiple times and repeatedly over different rides, Mr. Zanella:

- Slapped A.M. in the face;
- Elbowed A.M. in the face;
- Hit A.M. in the face and then hit him with his own backpack multiple times;
- Shoved A.M.'s backpack in his face;
- Dragged A.M. into a seat by his backpack;
- Pushed A.M. by the head as he was exiting the bus;
- Hit A.M. in the face with a closed fist;
- Kicked A.M.'s feet;
- Knocked and hit A.M. in the head;
- Knocked A.M.'s head into the window and shoved A.M. into the window;
- Kneed A.M. in the head;
- Poked and flicked A.M.;
- Slapped A.M.'s hands;
- Hit A.M. in the side;
- Hit A.M. in the back;
- Pushed A.M. from his seat;
- Pulled A.M.'s hair;
- Grabbed A.M.'s arm multiple times to lift him into or out of his seat or the aisle;
- Punched A.M. in the back;
- Hit A.M. in the neck;
- Pulled and pinched A.M.'s ear;
- Spit on A.M;
- Hit A.M. in the face with a shoe;
- Hit A.M. in the face with a water bottle; and
- Told A.M. that his dad doesn't like him.

27. Mr. Zanella clearly had a distinct hostility toward A.M. and singled him out for the

worst abuse and harassment, abusing him more frequently than any other child on the bus.

28. Mr. Zanella was not shy about the hate and disgust he felt for A.M., making comments to the bus driver, Defendant David Oliver, that Mr. Zanella "would be pissed if he [were] A.M.'s teacher's aide" and referring to him as "fucker" and "little shit." He even said that if A.M. were his kid, he would be dead by now because Mr. Zanella did not have that kind of patience. These comments show the intense level of hostility Mr. Zanella felt toward A.M. and the awareness of Defendant Oliver of Mr. Zanella's treatment of A.M.

29. When Mr. Zanella would approach A.M. on the bus, A.M. would try to cover his head and put his hands over his ears in an attempt to protect himself from Mr. Zanella.

30. On or around April 18, 2023, A.M. showed up to school with red marks on his face, which were noticed by his teacher, Jennifer Trinkaus-Randall, and not present when he got on the bus that morning.

31. On or around April 25, 2023, Ms. Randall again noticed marks on A.M.'s face, which she photographed and spoke with A.M.'s mother and Defendant Wayne Thornes about.

32. A.M. may have suffered from a seizure due to Mr. Zanella's assaults. A.M. had no history of seizures, yet he had a seizure at school on March 1, 2023, requiring him to go to the hospital. According to PSD, there is no bus video footage from that day, so it is likely not ever going to be possible to know for sure whether Zanella assaulted A.M. that day.

33. Starting at the beginning of the school year, when Zanella was hired, A.M. started displaying behavioral changes. He would have frequent accidents, including urinating on the floor of his room and in his pants when arriving at school or getting home, even though he had been toilet trained since he was four. He would try to run away from the bus to avoid getting on, and hide under the kitchen table when it was time to get ready for school.

34. A.M. began cowering, covering his head, and covering his ears both at home and at school. Often his cowering would include crying or trying to run away from the room. His parents, mystified by these behavioral changes, repeatedly reassured A.M. he was not in trouble, and they were not angry at him.

35. A.M. also insisted on wearing a blanket onto the bus that covered his head, as well as wearing the blanket when going out into the community. He had an intense amount of anxiety when he did not have the blanket. He began struggling with taking showers, something he had previously loved, because he did not like the water touching his head or his parents washing his hair. He started to develop an intense fear of the dark, and he had trouble sleeping through the night.

36. Around April 2023, there was a dramatic decrease in A.M.'s eating. Around May 2023, A.M. began crying at night, almost every night. A.M. also started pulling away from his parents when they would hug him, which he had previously loved.

37. A.M.'s therapist ultimately diagnosed him with post-traumatic stress disorder ("PTSD") caused by Mr. Zanella's repeated abuse and harassment. A.M.'s therapist anticipates that the trauma A.M. suffered will require years to treat.

38. Indeed, as recently as September 2024, A.M. suffered a trauma-induced incident on the school bus.

**Mr. Zanella tormented I.H.**

39. Mr. Zanella also enjoyed tormenting I.H., at times, making her cry or otherwise become obviously upset.

40. During different bus rides in March, April, and May 2023, Mr. Zanella:

- Stuck his knuckle into I.H.'s neck, then hit her cheek, causing her to cry;
- Pinched I.H. on the elbow, then said "what, did you hurt yourself?";

- Hit I.H. on arm multiple times, then hit her in the face;
- Hit I.H. several times in the head;
- Mocked I.H. with cruel rhetorical questions like "are you dumb?" and "can you say, 'Polly want a cracker?'";
- Swore at I.H. and tried to get her to repeat inappropriate words and phrases such as "fuck" and "dumb fuck";
- Kicked I.H. in the back of her leg causing her to stumble while she was exiting the bus;
- Threatened I.H. with a closed fist and shook his fist at her, causing her to flinch; and
- Pushed I.H. onto the seat while she was standing and shoved her toward the back of the bus.

41. I.H. tried to avoid Mr. Zanella's physical harm and mockery, often jumping between rows to avoid being near him and attempt to protect herself. Mr. Zanella would linger nearby and make jabs at her at every opportunity, even shoving her down while she stood in the middle aisle of the bus.

42. Mr. Zanella relished belittling I.H. and tested how far he could go until she would cry. I.H. suffered significant distress and fear, and it appears that Mr. Zanella provoked I.H. for the sheer purpose of causing her such distress.

43. Teaching non-verbal or semi-verbal children foul language is obviously designed to cause them to have even greater difficulty in social situations, school, and at home than they would otherwise, and is revelatory of a deep-seated animus and desire to belittle these children.

44. I.H.'s parents noticed behavioral changes in her over the course of the school year, including frequent bedwetting—which had not been an issue for her for years—and refusing to sleep at night. On several occasions, I.H., who is semi-verbal, would say "no bus, no bus." She rushed off the bus when she was dropped off at the end of the school day. She began not wanting to go to school, saying "no school."

45. I.H.'s relationships and schoolwork both suffered as a result of the abuse. She started hitting people and became self-destructive, using self-harm coping mechanisms such as biting herself and stealing toys from school.

46. I.H.'s parents witnessed significant behavioral changes and struggles with previously feasible tasks for I.H., such as showering, mealtime, and clean up. I.H. developed a habit of saying "no" excessively to things she used to love and be excited for, which coincided with the abuse.

47. Mr. Zanella's abuse of I.H. was substantially detrimental to her development, and her parents fear that the behavior she's exhibiting now, which she did not engage in prior to the abuse, will follow her for years to come, potentially into adulthood.

48. I.H.'s therapist diagnosed her with Unspecified PTSD and Unspecified Anxiety Disorder caused by Mr. Zanella's unlawful conduct. She now suffers from significant impairment in social functioning and daily living, tearfulness, low mood, nervousness, excessive fear, low self-belief, unusual physical aggression, and changes in mood and bodily functions.

**PSD and Individual Defendants are liable for the harm caused to Plaintiffs by Mr. Zanella.**

49. The Larimer County District Attorney's Office charged Mr. Zanella with 164 different offenses, including multiple counts of assault in the third degree, at-risk victim; multiple counts of child abuse; and multiple counts of harassment. The District Attorney identified several juvenile victims of Mr. Zanella's assaults, including A.M. and I.H.

50. Mr. Zanella pleaded guilty to seven counts of third-degree assault on an at-risk person, two counts of harassment, and two counts of child abuse – knowingly/recklessly causing bodily injury, and he was sentenced to 12 ½ years in prison. At sentencing, the judge stated:

> I have no idea who needs to hear this, and I have no idea if they're in this room or not, but you don't hire someone with a conviction of child abuse to be a paraprofessional to work with kids . . . . Not just kids, kids with special needs. That seems self-evident, but maybe it is not.

51. Indeed, at or around the time PSD and Individual Defendants hired Mr. Zanella,

they admittedly knew he had a previous conviction for child abuse. Mr. Zanella had been charged with knowing or reckless child abuse resulting in bodily injury in 2012, and he ultimately pleaded to child abuse – negligence in violation of C.R.S. § 18-6-401(1),(7)(B)(II). He was sentenced to eighteen months' probation.

52. Mr. Zanella intentionally hid his conviction from PSD when applying for the job. Only after his fingerprints were submitted by PSD to the CBI/FBI during a background check did PSD officials learn about his criminal history.

53. At the same time, PSD and Defendant Bickerton also learned that Mr. Zanella had other various arrests and citations for driving-related offense, including driving under the influence.

54. Defendant Bickerton reviewed the results of Mr. Zanella's background check shortly after he was hired and asked him to explain his failure to disclose the conviction on his application despite the requirement that he do so. Despite the conviction and Mr. Zanella's initial lie that he had no such conviction, Defendant Bickerton decided to allow Mr. Zanella to continue working at PSD in the same capacity, assisting and supervising children with special needs.

55. On information and belief, other PSD employees, whose identities are currently unknown to Plaintiffs but included in this action as Doe Defendants, discussed Mr. Zanella's criminal history with Defendant Bickerton and agreed with her decision to allow him to continue in the job.

56. Defendant Bickerton's decision was pursuant to and consistent with PSD's policy, custom, practice, and training on hiring and supervision.

57. Defendant Bickerton permitted a person who intentionally lied on his employment application, and then admitted as much when his fingerprints revealed a child abuse conviction, to

act as a school bus aide to the most vulnerable children in the district.

58. PSD had allowed Mr. Zanella to start working before receiving the results of his background check, showing that PSD willingly placed students at risk from individuals with criminal history that PSD learned about only after hirees had contact with children. Such indifference to the safety of student illustrates PSD's custom and training of recklessness in its hiring practices.

59. Ignoring lies on applications and allowing convicted criminals with a history of child abuse to be employed by PSD is custom, practice, and policy of PSD.

60. Throughout the 2022-2023 school year, A.M.'s parents made multiple complaints about Mr. Zanella, including that he lacked patience, was not qualified, and had told them that A.M. was "too difficult." They had requested PSD to remove Mr. Zanella from A.M.'s bus route.

61. In response, PSD, the named Defendants, and those PSD employees who had notice of A.M.'s complaints, whose identities are currently unknown to Plaintiffs but included as Defendants in this action as Doe Defendants, took no significant action, if any, and no one from PSD, including Doe Defendants, watched bus surveillance that would have revealed the extent of the abuse.

62. In November and December 2022, PSD was provided additional notice that Mr. Zanella posed a danger to students when the mother of two children, SLE, made a complaint that Mr. Zanella had pulled one of her daughter's hair and flipped her off.

63. SLE complained in November to Defendant Sonja Novovesky, Transportation Supervisor for PSD. Defendant Novovesky laughed off and dismissed the mother's concerns, and told SLE that Mr. Zanella was a "good guy."

64. Defendant Novovesky spoke to Mr. Zanella and bus driver Defendant Oliver

about the SLE's complaint, and they told her SLE's children were "liars and like[d] to stir up trouble."

65. Defendant Novovesky never called SLE back.

66. Defendant Novovesky failed to take any effective remedial action in response to Mr. Zanella's abuse, and Defendant Novovesky did not comply with mandatory reporting laws.

67. In December of 2022, SLE again reported this incident, this time to a family liaison for Shepardson Elementary. The family liaison, Jenny Reyes, emailed Defendant Wayne Thornes, Principal of Shepardson Elementary, relayed that Mr. Zanella pulled SLE's daughter's hair and flipped her off, that both of SLE's daughters were crying about the incident, and they were too intimidated to take the bus anymore.

68. Defendant Thornes did not take any effective remedial action in response, encouraging the children to give Mr. Zanella another chance, and merely telling Mr. Zanella to stop. He further violated the mandatory reporting law by failing to report to the relevant authorities that Mr. Zanella inflicted physical abuse on a child.

69. Neither Defendant Thornes nor Defendant Novovesky put into place any monitoring of the readily available video footage going forward, despite these complaints.

70. Due to this complaint, Defendant Oliver was then—if not sooner—also put on notice about Mr. Zanella's alleged abusive tendencies, yet he willfully did nothing, which led to further abuse as it continued against Plaintiffs A.M. and I.H. and other children.

71. Additionally, in the 2022 school year, bruises and handprint marks left on another student, XHK, who is also non-verbal, were noticed by his mother, PM, multiple times. PM complained to the child's teacher, Alex Pewitt, on at least two occasions. Ms. Pewitt did not report the complaints nor investigate how XHK came to be injured.

72. On information and belief, another complaint by a parent of a child against Mr. Zanella was made on or about January 2023, and PSD and Doe Defendants, whose identities are not known to Plaintiffs at this time but are included as Defendants in this action as Doe Defendants, failed to conduct any investigation in response.

73. On or about April 19, 2023, Ms. Randall emailed Defendant Thornes that Mr. Zanella was lifting students by their wrists to place them into seats, thereby exposing small, very thin children to injury. Defendant Thornes again spoke with Mr. Zanella but did not review any footage, discipline Mr. Zanella, or take any further action to protect students, despite Defendant Thornes' prior knowledge about Mr. Zanella's physical and emotional abuse of SLE's daughter.

74. On or around April 25, 2023, Ms. Randall informed Defendant Thornes about the bruise on A.M.'s face and she reiterated her concerns that Mr. Zanella was mishandling students and not following the correct training for managing student behavior. Despite the readily available video evidence, Defendant Thornes merely asked Mr. Zanella and Defendant Oliver what happened. Mr. Zanella said A.M. "brushed his own head against the seat in front of him."

75. Although at this point having learned of at least three instances of Mr. Zanella allegedly physically abusing children, Defendant Thornes took no further action to protect the students, including Plaintiff A.M., from Mr. Zanella. He continued to violate mandatory reporting laws by not contacting appropriate authorities despite indications of abuse.

76. Finally, on May 22, 2023, TP, a mother of another student, emailed the transportation email account complaining that her eight-year-old daughter was called a "little bitch" by Mr. Zanella. She attached snap chats between her children talking about how Mr. Zanella talks down to the children on the bus who had autism.

77. Defendant Oliver continued to willfully and consciously ignore Mr. Zanella's

conduct despite being on notice about the danger Mr. Zanella posed to special needs children on the bus. Indeed, on or around May 23, 2023, Mr. Zanella and Defendant Oliver had a conversation about visiting with assault rifles TP's house, showing that Defendant Oliver shared in Mr. Zanella's hostility toward the children:

> Defendant Oliver: "I think we should buy some assault rifles and go down to [TP's] house."
> Mr. Zanella: "Fuck, I don't need to do that. I'll give you my gun and [inaudible] then I'll take my [inaudible]. Just take my handgun. An assault rifle would be more fun though. I have an Uzi. That would be fun….
> Defendant Oliver: "Oh, yeah. Chop 'em off at the knees though, we want them to suffer."

78. Defendant Oliver retired at the end of the 2022-2023 school year, and, on information and belief, should not be eligible for rehire due to his involvement in the events complained of herein.

79. Accordingly, PSD and Individual Defendants are directly to blame for the repeated abuse A.M. and I.H. suffered, which has resulted in severe psychological harm.

80. A.M. and I.H. have suffered and continue to suffer trauma beyond comprehension. Both of their families have suffered significantly. No parents should have to learn about their child being repeatedly assaulted in a space they had trusted to be safe.

81. Defendants' unlawful conduct caused A.M., I.H., and their families substantial damages.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### 14th Amendment – Deliberate Indifference
### (Against All Defendants)

82. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

83. At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

84. At all relevant times, the actions and inactions of Individual Defendants were taken within the course and scope of their official duties and employment with PSD.

85. Plaintiffs had a clearly established right under the Fourteenth Amendment to be free from unlawful invasion of bodily integrity.

86. By harassing and assaulting Plaintiffs, Mr. Zanella violated Plaintiffs' right to be secure in their bodily integrity, a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

87. Mr. Zanella had no need to use force against Plaintiffs, and thus his use of force against them was disproportionate to the need presented and inspired by malice or sadism.

88. Mr. Zanella's conduct against Plaintiffs amounted to a brutal and inhumane abuse of official power.

89. When viewed in total, Mr. Zanella's conduct is outrageous and shocks the conscience.

90. Plaintiffs were elementary school children with severe disabilities, thereby rendering them completely helpless and at the mercy of the employees of PSD and its employees, including Mr. Zanella and Individual Defendants. Unlike older students without disabilities, these Plaintiffs had no way to protect themselves or even raise an outcry for help. Thus, a special relationship existed between Plaintiffs and PSD and its employees in which PSD and Individual Defendants had an affirmative duty to protect Plaintiffs while they were under the control of PSD.

91. PSD's and Individual Defendants' decision to hire Mr. Zanella despite knowing of his conviction for child abuse and other offenses, as well as Individual Defendants' failure to take

prompt and effective remedial action in response to complaints against Mr. Zanella and notice of the danger he posed to students like Plaintiffs, show that PSD and Individual Defendants knew or were aware that Plaintiffs faced a substantial risk of serious harm and knowingly or recklessly disregarded this risk of harm.

92. PSD and Individual Defendants were thus deliberately indifferent to the substantial risk of serious harm to Plaintiffs' safety, despite notice that Mr. Zanella presented an excessive risk to Plaintiffs' safety. Defendants made a conscious and deliberate decision not to take adequate action to protect Plaintiffs from abuse by Mr. Zanella or to fail to intervene in Mr. Zanella's abuse.

93. Further, PSD and Defendants Thornes, Bickerton, and Novovesky knowingly or recklessly failed to have adequate policies and training to address abuse by school employees despite the obvious need for such, as demonstrated by, for example, the numerous Defendants and other employees involved in failing to protect Plaintiffs from Mr. Zanella.

94. PSD and Defendants Thornes, Bickerton, and Novovesky gave no guidance to PSD employees regarding the practice of hiring convicted child abusers to act as protectors to incredibly vulnerable children.

95. PSD and Defendants Thornes, Bickerton, and Novovesky's custom, practice, and policy did not include checking video recordings from buses for evidence of child abuse, despite numerous complaints filed against a convicted child abuser acting as a school bus aide.

96. PSD was on notice of its defective customs, policies, training, and/or practices.

97. The need for additional, different, and/or adequate policies, customs, training, and/or supervision was obvious, and the PSD exhibited deliberate indifference to the known and substantial risk of harm to Plaintiffs and others by failing to create and/or implement such policies, customs, training, and/or supervision.

98. PSD's failure to create and/or implement such policies, customs, training, and/or supervision was substantially certain to cause PSD employees to do nothing to protect children when someone like Mr. Zanella violated the constitutional rights of students like Plaintiffs.

99. PSD consciously or deliberately chose to disregard this risk in failing to implement and/or create such policies, customs, training, and/or supervision. These acts and/or omissions constituted a deliberate choice by PSD among several alternatives to pursue a course of action regarding creating and implementing policies, training, supervision, and customs in this area.

100. PSD and Defendants Thornes, Bickerton, and Novovesky are liable for their deliberately indifferent policies, training, practices, habits, customs, widespread usages, and failures in hiring, training, and supervising their employees with respect to protecting children like Plaintiffs.

101. All Defendants are directly liable for their own failure to intervene in Mr. Zanella's abuse or deliberately indifferent policies, customs, and practices that were moving forces in Plaintiffs' constitutional injuries, and PSD and Defendants Thornes, Bickerton, and Novovesky are liable for deliberately indifferent hiring, training, and supervision of employees including Mr. Zanella and other PSD employees.

102. All Defendants knew that their acts or omissions were substantially certain to cause PSD employees like Mr. Zanella to violate constitutional rights of children like Plaintiffs to be secure in their bodily integrity, and all Defendants consciously, deliberately, or recklessly chose to disregard this risk of harm in failing to provide and/or in deliberately choosing not to intervene in Mr. Zanella's abuse or provide effective hiring, training, supervision, and discipline of employees, and/or Mr. Zanella, regarding abuse of students, especially young students with special needs.

103. In light of the duties and responsibilities of Mr. Zanella, and the extreme vulnerability of children like Plaintiffs, the need for training, supervision, and discipline regarding abuse was so obvious, and the inadequacy of existing hiring, training, and/or supervision was so likely to result in the violation of constitutional rights, such as those described herein, that PSD's and Defendants Thornes, Bickerton, and Novovesky's failure to appropriately train and/or supervise PSD employees including Mr. Zanella and Individual Defendants constituted deliberate indifference to the rights of children like Plaintiffs to be secure in their bodily integrity.

104. Defendants PSD and Defendants Thornes, Bickerton, and Novovesky exhibited deliberate indifference to the substantial and obvious risk of harm to Plaintiffs by continuing to employ Mr. Zanella in a position where he could abuse students like Plaintiffs despite the known and obvious risk of substantial harm Mr. Zanella posed to students, including Plaintiffs.

105. All Defendants, by and through their official duties, proximately caused an unconstitutional invasion of Plaintiff's bodily integrity by failing to implement effective practices, policies, discipline, and procedures that would have protected students, including Plaintiffs, from the substantial and known risk of serious harm posed by Mr. Zanella and/or by failing to intervene in Mr. Zanella's abuse.

106. Thus, all Defendants' deliberately indifferent policies, customs, practices, and/or failures to adequately intervene, hire, train, and/or supervise were moving forces in the violation of Plaintiffs' constitutional rights.

107. All Defendants were on notice that their deliberate indifference would result in the type of harm Plaintiffs suffered.

108. All Defendants' failures in intervening, hiring, training, and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the

Plaintiffs and a moving force in the complained of injuries of Plaintiffs.

109. Defendants' conscious and deliberate decisions not to protect Plaintiffs, despite knowledge of the risk to their safety from Mr. Zanella, constitute deliberate indifference to and willful and wanton disregard of the substantial risk of serious harm to Plaintiffs, in violation of the Fourteenth Amendment's due process clause.

110. All Defendants' described conduct set in motion a series of events that they knew would cause a child in a similar situation as Plaintiffs to be deprived of their constitutional rights to bodily integrity. But for the above acts or omissions of all Defendants, Plaintiffs would not have been subjected to a violation of their constitutional rights, and such a deprivation was a natural and foreseeable consequence of Defendants' acts and omissions.

111. Defendants set in motion a series of events that they knew or reasonably should have known would cause Mr. Zanella to deprive Plaintiffs of their constitutional rights.

112. The acts and omissions in which Mr. Zanella and Individual Defendants engaged were because of, and pursuant to the customs, policy, training, and/or practices of PSD.

113. As a direct and proximate cause and consequence of the unconstitutional policies, procedures, training, customs, acts, omissions, and/or practices described above, Plaintiffs suffered and continues to suffer injuries, damages and losses as set forth herein.

114. The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Plaintiffs' constitutional rights.

115. The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited physical and mental pain, loss of enjoyment of life, and other damages.

116. The herein described acts and inactions were taken by Individual Defendants in

reckless and callous indifference to the federally protected rights of Plaintiffs, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

117. The intentional actions or inactions of each Defendant as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused other damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 12131 *et seq.***
**Title II of the Americans with Disabilities Act of 1990, as Amended**
**Disability-Based Harassment and Discrimination**
**(Against Defendant PSD)**

118. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

119. PSD's schools are public entities within the meaning of Title II of the ADA.

120. At all relevant times, Plaintiffs were individuals with disabilities within the meaning of the ADA.

121. Plaintiffs were qualified individuals with a disability within the meaning of Title II of the ADA because at all relevant times, they met the essential eligibility requirements for the receipt of services provided by, or the participation in programs or activities at, PSD or PSD facilities.

122. PSD and its employees had knowledge of Plaintiffs' disabilities.

123. Plaintiffs were harassed and assaulted by Mr. Zanella based on their disabilities.

124. Mr. Zanella's harassment and assaults on Plaintiffs was sufficiently severe or pervasive that it altered the condition of their education and created an abusive educational

environment.

125. PSD was on notice of Mr. Zanella's harassment and assaults on students with disabilities like Plaintiffs.

126. PSD was deliberately indifferent to Mr. Zanella's horrific abuse by hiring Mr. Zanella and failing to take prompt remedial and effective measures when provided notice.

127. Because of PSD's deliberate indifference to pervasive, severe disability-based harassment and assault, Plaintiffs were effectively deprived of the opportunity to participate in or benefit from services, programs, or activities of PSD.

128. Plaintiffs were denied access to government services and benefits, including, for example, the benefit of education in an appropriate environment free from abuse; the service of reporting the abuse to the relevant governmental authorities to obtain an investigation into Mr. Zanella based on the previous complaints against him, as detailed above; the benefit of a safe bus ride to and from school because Plaintiffs were afraid to ride the bus; and the full educational opportunities to which Plaintiffs were entitled because Plaintiffs could not focus on school due to the abuse and the psychological harm caused by the abuse, including PTSD.

129. Such exclusion, denial of benefits, and/or discrimination was by reason of Plaintiffs' disabilities. For instance, Plaintiffs were not permitted the opportunity to participate in the benefits which would follow from the service of reporting the abuse to the authorities (e.g., the police), and that the denial of benefits occurred because Plaintiffs were non-verbal/semi-verbal and could not report the abuse themselves or provide information rebutting Mr. Zanella's and Defendant Oliver's lies. In this respect, PSD treated Plaintiffs less favorably than nondisabled students under the mandatory reporting requirements of Colorado law.

130. PSD's above acts or omissions were taken willfully and wantonly or with deliberate

indifference to the strong likelihood that doing so would likely result in a violation of the ADA or its implementing regulations.

131. PSD failed to properly train, supervise and/or discipline its employees regarding the proper treatment of, and accommodations for, individuals with disabilities.

132. This inadequate training, supervision, and/or discipline resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to PSD.

133. In light of the duties and responsibilities of PSD personnel, the need for specialized training, supervision and discipline regarding such decisions was so obvious, and the inadequacy of appropriate training and/or supervision was so likely to result in a violation of federally protected rights, such as those described herein, that PSD is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

134. Such failure to properly train and supervise was the moving force behind and proximate cause of the violations of Plaintiff's federally protected rights described herein.

135. The violation by PSD of Title II of the ADA caused Plaintiffs injuries and associated damages.

**THIRD CLAIM FOR RELIEF**
**29 U.S.C. § 701, *et seq.***
**Section 504 of the Rehabilitation Act –**
**Disability-Based Harassment and Discrimination**
**(Against Defendant PSD)**

136. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

137. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from

> the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

138. At all relevant times, Plaintiffs were individuals with disabilties within the meaning of the Rehabilitation Act of 1973.

139. PSD receives and benefits from federal financial assistance as that term is used in 29 U.S.C. § 794.

140. PSD has discriminated against Plaintiffs on the basis of disability in violation of 29 U.S.C. § 794 and its implementing regulations as described herein.

141. Plaintiffs were qualified individuals with disabilities within the meaning of the Rehabilitation Act of 1973 because at all relevant times, they were qualified to participate in the services, programs, activities, and benefits provided to PSD students.

142. PSD and its employees had knowledge of Plaintiffs' disabilities.

143. Plaintiffs were harassed and assaulted by Mr. Zanella based on their disabilities.

144. Mr. Zanella's harassment and assaults on Plaintiffs was sufficiently severe or pervasive that it altered the condition of their education and created an abusive educational environment.

145. PSD was on notice of Mr. Zanella's harassment and assaults on students like Plaintiffs.

146. PSD was deliberately indifferent to Mr. Zanella's harassment and assaults by failing to take prompt remedial and effective measures when provided notice, as described above.

147. Because of PSD's deliberate indifference to pervasive, severe disability-based harassment and assaults, Plaintiffs were effectively deprived of the opportunity to participate in or benefit from programs or activities of PSD.

148. PSD denied Plaintiffs access to programs, benefits, and services on the basis of

their disabilities and for which they were qualified to participate, thereby violating the Rehabilitation Act of 1973.

149. Plaintiffs were denied access to government services and benefits, including, for example, the benefit of education in an appropriate environment free from abuse; the service of reporting the abuse to the relevant governmental authorities to obtain an investigation into Mr. Zanella based on the previous complaints against him, as detailed above; the benefit of a safe bus ride to and from school because Plaintiffs were afraid to ride the bus; and the full educational opportunities to which Plaintiffs were entitled because Plaintiffs could not focus on school due to the abuse and the psychological harm caused by the abuse, including PTSD.

150. Such exclusion, denial of benefits, and/or discrimination was by reason of Plaintiffs' disabilities. For instance, Plaintiffs were not permitted the opportunity to participate in the benefits which would follow from the service of reporting the abuse to the authorities (e.g., the police), and that the denial of benefits occurred because Plaintiffs were non-verbal/semi-verbal and could not report the abuse themselves or provide information rebutting Mr. Zanella's and Defendant Oliver's lies. In this respect, PSD treated Plaintiffs less favorably than nondisabled students under the mandatory reporting requirements of Colorado law.

151. In violating the Rehabilitation Act, PSD acted intentionally, maliciously, and/or with reckless and/or deliberate indifference to Plaintiffs' federally protected rights.

152. As a direct and proximate result of the acts, omissions, and violations alleged above, Plaintiffs have suffered damages, including but not limited to pain and suffering, inconvenience, emotional distress, and impairment of quality of life.

## FOURTH CLAIM FOR RELIEF
## Negligence
## (Against Individual Defendants)

153. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

154. At all relevant times, Individual Defendants acted willfully and wantonly and with a conscious disregard for the safety of others and thus are not entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

155. At all relevant times, Individual Defendants were acting within the course and scope of their employment with PSD.

156. A special relationship existed between Plaintiffs as disabled students and Individual Defendants as school officials.

157. Individual Defendants had a duty to Plaintiffs to provide them a reasonably safe environment and to adequately hire, train, and supervise school employees to ensure Plaintiffs' safety.

158. Individual Defendants owed Plaintiffs a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of school officials in similar situations.

159. Individual Defendants breached their duty of reasonable care to Plaintiffs when, among other things, they hired Mr. Zanella, failed to intervene in Mr. Zanella's abuse and harassment, failed to reasonably respond to complaints about Mr. Zanella or notice of the abuse he inflicted, and/or failed to train and/or set policies for PSD employees in a manner that reasonably protected students like Plaintiffs from abuse by PSD employees.

160. Individual Defendants knew or should have known that the lack of adequate hiring, supervision, and training of PSD employees, and/or intervention in Mr. Zanella's abuse, was likely to harm students, like Plaintiffs.

161. In failing to exercise reasonable care in the hiring, training, and supervision of PSD

employees, and/or the intervention in Mr. Zanella's abuse, as it relates to reasonably protecting students like Plaintiffs from abuse by PSD employees, Individual Defendants negligently and proximately caused Plaintiffs' injuries.

162. As a direct and proximate result of the Individual Defendants' breach of their duty to Plaintiffs, Plaintiffs have suffered and suffer significant mental pain and suffering and other damages.

163. The negligent acts and omissions by Individual Defendants were a substantial and significant contributing cause of Plaintiffs' injuries, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Plaintiffs have suffered and are suffering.

164. As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, impairment in quality of life, emotional distress, and loss of consortium.

165. Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiffs of their lawful rights.[1]

**FIFTH CLAIM FOR RELIEF**
**Negligence Per Se**
**(Against Defendants Thornes, Oliver, and Novovesky)**

166. Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

[1] Given the circumstances of malice and willful and wanton conduct surrounding Individual Defendants' actions, Plaintiffs anticipate seeking exemplary damages for Defendants' negligence once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

167. At all relevant times, Defendants Thornes, Oliver, and Novovesky acted willfully and wantonly and with a conscious disregard for the safety of others and thus are not entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

168. At all relevant times, Defendants Thornes, Oliver, and Novovesky were acting within the course and scope of their employment with PSD.

169. At all relevant times, COLO. REV. STAT. § 19-3-304(1)(a) provide that "any person specified in subsection (2) of this section"—which included Defendants Thornes, Oliver, and Novovesky because they were public school officials or employees—"who has reasonable cause to know or suspect that a child has been subjected to abuse or neglect or who has observed the child being subjected to circumstances or conditions that would reasonably result in abuse or neglect shall immediately upon receiving such information report or cause a report to be made of such fact to the county department, the local law enforcement agency, or through the child abuse reporting hotline," and subsection (4) provided that "[a]ny person who willfully violates the provisions of subsection (1)…[c]ommits a class 2 misdemeanor" and "[s]hall be liable for damages proximately caused thereby."

170. Plaintiffs are members of the group of persons the statutes quoted and cited above were intended to protect.

171. One of the purposes of this statute was to protect against the type of injuries sustained by Plaintiffs due to Defendants Thornes, Oliver, and Novovesky's willful failure to report Mr. Zanella's abuse and harassment to the required authorities.

172. Defendants Thornes, Oliver, and Novovesky's willful failure to report Mr. Zanella's abuse and harassment to the required authorities violated COLO. REV. STAT. § 19-3-304.

173. Plaintiffs suffered damages as a result of Defendants Thornes, Oliver, and

Novovesky's statutory violations described herein, and Plaintiffs injuries were proximately, actually, and legally caused by such violations.

174. As a result of Defendants Thornes, Oliver, and Novovesky's negligence per se, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, impairment in quality of life, emotional distress, and loss of consortium.

175. Defendants Thornes, Oliver, and Novovesky's conduct was attended by circumstances of malice, or willful and wanton conduct, which this Defendant must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiffs or their lawful rights.[2]

**SIXTH CLAIM FOR RELIEF**
**Outrageous Conduct**
**(Against Individual Defendants)**

176. Plaintiffs hereby incorporate all allegations contained in this Complaint as though fully set forth herein.

177. At all relevant times, Individual Defendants acted willfully and wantonly and with a conscious disregard for the safety of others and thus are not entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

178. These Defendants engaged in extremely egregious conduct consisting of, among other things, Individual Defendants' hiring of Mr. Zanella—an individual convicted of child abuse—to work with young children with special needs and Individual Defendants' failure to remove Mr. Zanella from his position despite ample notice of potential abuse.

---

[2] Given the circumstances of malice and willful and wanton conduct surrounding these Defendants' conduct, Plaintiffs anticipate seeking exemplary damages for negligence per se once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

179. When Individual Defendants engaged in this conduct, they knew or should have known that it was substantially probable to cause Plaintiffs severe emotional distress.

180. This conduct had a high probability of causing Plaintiffs severe emotional distress and did cause Plaintiffs severe emotional distress.

181. These Defendants' conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable by reasonable members of a civilized community.

182. As a result of these Defendants' extreme and outrageous conduct, Plaintiffs suffered severe emotional distress including severe mental suffering, anguish, humiliation, shame, and fear.

183. Individual Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which these Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Plaintiffs or their lawful rights.[3]

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment for the Plaintiffs and against each of the Defendants, and award them Plaintiffs relief as allowed by law and equity, including, but not limited to the following:

(a) Declaratory relief and injunctive relief, as appropriate;

(b) Economic losses on all claims allowed by law in an amount to be determined at trial;

[3] Given the circumstances of malice and willful and wanton conduct surrounding Individual Defendants' actions, Plaintiffs anticipate seeking exemplary damages for Defendants' outrageous conduct once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

(c) Compensatory and consequential damages, including, but not limited to those for past and future losses, damages for emotional distress, loss of enjoyment of life, loss of consortium, and pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e) Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f) Pre- and post-judgment interest at the highest lawful rate; and

(g) Any further relief as justice requires and that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 1st day of October 2024.

*s/ David A. Lane*
David A. Lane
Liana Orshan
KILLMER LANE, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
dlane@killmerlane.com
lorshan@killmerlane.com

ATTORNEYS FOR PLAINTIFF A.M.

*s/Erica Grossman*
Anna Holland Edwards
Erica Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High St.
Denver, Colorado 80218
Phone: (303) 860-1331
anna@hheglaw.com
erica@hheglaw.com

ATTORNEYS FOR PLAINTIFF I.H.